Marc P. Berger
Lara S. Mehraban
Wendy Tepperman
Richard Hong
Cynthia Matthews
Jon A. Daniels
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0056 (Hong)
Email: hongr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | 19 Civ. |
| - against - | **COMPLAINT** |
| **JONATHAN C. LUCAS,** | |
| Defendant. | |

------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendant Jonathan C. Lucas ("Lucas" or the "Defendant"), alleges as follows:

### SUMMARY

1. Beginning in late August 2017, Lucas raised approximately $63,000 in cryptocurrency from more than 100 investors through the fraudulent offer and sale of unregistered digital securities of Fantasy Market ("FM"), a purported online marketplace that he created and controlled.

2. Lucas wrote and disseminated an offering prospectus, in the form of a "whitepaper" ("FM Whitepaper"), in which he claimed that Fantasy Market would allow participants to control live adult entertainment performances by paying for specific requested activities with the Fantasy Market digital token ("FMT"). The FM Whitepaper further touted that the value of FMTs would rise as demand for the Fantasy Market platform increased, enabling investors to trade or to sell their FMTs for a profit. Lucas sold FMTs as part of a self-described initial coin offering ("ICO"), a term that is meant to describe the offer and sale of digital assets issued and distributed on a blockchain. Investors purchased FMTs with virtual currencies (other digital assets such as ethereum or bitcoin), which Lucas pooled in digital asset wallets.

3. Lucas knowingly or recklessly made numerous material misrepresentations in the FM Whitepaper and on other online platforms to induce prospective investors to purchase FMTs in the Fantasy Market ICO, including falsely touting: (1) the achievement of significant business development milestones, such as a "working-beta" version of the company's online platform, when no such version existed; (2) the experience of the Fantasy Market team, when in fact, the identified team members (other than Lucas) were entirely fictional and Lucas's own credentials were embellished; and (3) that a significant amount of funds was previously raised from large investors in a private token "pre-sale," when, in fact, no such amount was raised.

4. In addition, there was no registration statement in effect for the Fantasy Market ICO, and no exemption from registration was available. Lucas and Fantasy Market generally solicited investors for the Fantasy Market ICO using statements posted on the internet and distributed throughout the world, including in the United States, and the securities were offered and sold to the general public, including to United States investors, in this district and elsewhere.

5. Lucas, individually and through Fantasy Market, engaged in an illegal unregistered securities offering and, in connection with the offering, engaged in fraudulent conduct and made material misstatements and omissions designed to deceive investors in connection with the offer and sale of securities in the Fantasy Market ICO.

**VIOLATIONS**

6. By engaging in the conduct set forth in this Complaint, Defendant engaged in securities fraud in violation of Section 17(a)(1), (2), and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (2), and (3)], Section 10(b) of the Securities Exchange Act ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)], and, without a registration statement being in effect or filed, Defendant engaged in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

**NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

7. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and (d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

8. Through this action, the Commission seeks a final judgment: (a) permanently enjoining Defendant from engaging in the acts, practices and courses of business alleged herein; (b) imposing a civil money penalty on Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (c) prohibiting Defendant, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any public company; and (d) prohibiting Defendant, pursuant to Section 21(d)(5) of

the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in the issuance, purchase, offer, or sale of any security, digital or otherwise, in an unregistered offering by an issuer.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendant, directly or indirectly, has made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Among other reasons, Defendant promoted and conducted the ICO in part from this District, including the development of the FM Whitepaper and website as well as communications with potential investors.

## FACTS

### I. Defendant

11. **Jonathan C. Lucas**, age 27, was the founder and Chief Executive Officer ("CEO") of Fantasy Market. He currently resides in Morris County, New Jersey. During the period of the Fantasy Market offering, Lucas often stayed and worked in New York, New York.

### II. Other Relevant Entity

12. **Fantasy Market,** an unincorporated entity that is now defunct, was a purported online marketplace founded in June 2017 by Lucas, who owned and controlled the entity at all relevant times.

### III. Background on ICOs

13. An ICO is a fundraising event in which an entity offers participants a unique digital asset, often referred to as a "coin" or "token," in exchange for consideration (often in the form of other digital assets – most commonly bitcoin and ether – or fiat currency). The tokens are issued on a "blockchain" or cryptographically-secured ledger.[1]

14. Generally, a token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain products or services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called exchanges, and can be traded for other digital assets or fiat currencies. Often, the tokens are immediately tradeable.

15. ICOs are typically announced and promoted through public online channels. The prospectus soliciting the public to acquire tokens in the ICO is usually in the form of a whitepaper, describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often bitcoin or ether) to the issuer's digital address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

---

[1] A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

**IV.     Defendant's Unregistered Offer and Sale of Securities Through the Fantasy Market ICO**

    **A.     Lucas Creates the Fantasy Market ICO**

16.     In August 2017, Lucas created and launched the Fantasy Market website and social media pages, including a Facebook page and Twitter account as well as posts on various message boards (collectively, the "FM Web Pages"). Lucas took these actions shortly after coming up with the idea for Fantasy Market and before any meaningful steps had been taken to create such a platform or otherwise develop its business.

17.     Lucas controlled all aspects of Fantasy Market operations, including its website, marketing, strategy, and ICO. Lucas bore sole responsibility for the content on the FM Web Pages, including the FM Whitepaper posted to these sites, and was involved at every level in editing and revising each version of the FM Whitepaper.

18.     Lucas presented himself as the CEO of Fantasy Market, and served as the point of contact for the company, including for: (1) communications with investors and prospective investors in the Fantasy Market ICO; (2) interviews with newspapers; and (3) participation in discussions about the Fantasy Market ICO on the Internet.

    **B.     Lucas Promotes and Sells the Fantasy Market ICO**

19.     Lucas prepared the FM Whitepaper to generate investor interest in the Fantasy Market platform and the ICO. Lucas made the FM Whitepaper publicly-available to prospective investors on the Fantasy Market website. Lucas also understood that various other internet platforms, promoting either the Fantasy Market ICO specifically or cryptocurrency ICOs more generally, also made the FM Whitepaper publicly available.

20.     Lucas, including through the FM Web Pages and the FM Whitepaper, stated that the Fantasy Market ICO would take place during a fixed six-week period from September 3,

6

2017 through October 16, 2017, consisting of a two-week "Pre-Sale," followed by a four-week "Public Token Sale." Lucas also sold a limited number of FMTs to certain investors beginning on or about August 29, 2017—in advance of the stated "pre-sale" date—through at least on or about November 2, 2017—after the end of the "public token" sale period.

21. The FMTs offered to participants in the Fantasy Market ICO were purportedly digital tokens issued on the ERC-20 blockchain.[2] Investors could purchase FMTs using ether, bitcoin, or litecoin, and the price of FMTs for the duration of the sale was 5 FMTs = $1, regardless of the cryptocurrency used to invest.

22. Lucas made FMTs available for purchase by individuals in the United States and worldwide and without restricting sales in the United States to accredited investors. Lucas did not take any steps to verify any purchaser's accreditation, and in fact, unaccredited investors participated in the Fantasy Market offering.

23. Lucas ultimately raised approximately $63,000 from more than 100 investors in the Fantasy Market ICO, including investors located in the United States.

C. **The Fantasy Market Whitepaper**

24. According to the FM Whitepaper, the purpose of the Fantasy Market ICO was to raise capital to enable Fantasy Market to complete and operate the Fantasy Market platform. Fantasy Market sought to raise approximately $25 million by selling 125 million FMTs.

25. FMTs purportedly would be used as a form of payment in connection with adult performances. However, the FM Whitepaper repeatedly touted FMTs as investments. For example, the FM Whitepaper stated that "early investors will be well positioned to capitalize on their initial token investment" and that "those who repurchase their tokens at the discounted price

---

[2] The ERC-20 blockchain refers to Ethereum, which is an open source, public blockchain network. Ether is the value token operating on the Ethereum blockchain.

7

may resell them elsewhere for a profit ….″ Moreover, "[t]hose who didn't participate in the token sale will likely realize they missed out, and seek to acquire [FMTs]. The sooner they're able to be traded, the sooner they will increase in value. For this reason, **the [FMT] will be listed on three major exchanges by October 1, 2017.**" (Emphasis in original.)

26. The FM Whitepaper also detailed its "aggressive token buyback program" and emphasized to potential purchasers how they could profit from those efforts: "Participants will purchase their FMT well below their projected open market price…. As platform demand continues to increase, the limited available supply of tokens will become even more valuable…. Those who choose to repurchase tokens from us can then flip them for a profit, or continue to use them within the platform."

27. In a section of the FM Whitepaper entitled "Business Opportunity," Lucas included the following chart suggesting that the price was expected to rise more than 600% following the ICO:



D. **The Fantasy Market Tokens Are Securities**

28. Lucas's FM Whitepaper, which provided that investor assets in the investment of FMTs would be pooled in digital asset wallets, led investors to have a reasonable expectation of

8

profits, based on the efforts of Fantasy Market and Lucas to achieve specific promised milestones.

29.     The investments offered and sold during the Fantasy Market ICO were therefore "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)]. No registration statement was filed for the FM ICO and no exemption from registration applied.

### V.     The Fantasy Market ICO was Fraudulent

30.     Lucas engaged in fraudulent conduct to induce investors to purchase FMT.

31.     Among other things, Lucas made numerous materially false or misleading statements in the FM Whitepaper and in other venues regarding: (1) Fantasy Market's platform development status; (2) the purported Fantasy Market team; and (3) the amount and use of ICO proceeds. Defendant made each of these materially false or misleading statements knowingly, or at least recklessly.

#### A.     Defendant's Fraudulent Claims Regarding the Fantasy Market Platform

32.     Lucas falsely claimed in the FM Whitepaper that Fantasy Market had been in existence for a year at the time of the offering, representing that "Fantasy Market officially launched in 2017, though [it] has been in operation since mid-2016." In addition, the FM Whitepaper and FM Website contained a picture of the company's "roadmap," which showed that from Q3 2016 to Q2 2017, Fantasy Market had, among other things, formalized a partnership with a leading augmented reality and virtual reality provider, successfully completed a working web client, and received statements of interest from over 100 "top quality performers." In fact, none of these developments had occurred at the time Lucas published the FM Whitepaper.

9

33. Lucas also claimed in the FM Whitepaper, to have developed a "working-beta" version of the platform. The stated purpose of the ICO was to "accelerate the completion" of this platform and move it into "full-scale production." However, no such "working-beta" version of the platform existed; in fact, no substantive work on the platform had even started at the time of the ICO.

34. Similarly, Lucas claimed in the FM Whitepaper that "several strategic partnerships were finalized with world class entertainment and technology companies" in 2017. In fact, Fantasy Market did not have any such agreements or partnerships.

**B.  Defendant's Fraudulent Claims Regarding the Fantasy Market Team**

35. Lucas highlighted the purported credentials, abilities and management skills of FM employees on Fantasy Market's website and in other marketing materials. The FM Whitepaper, for example, stated that "the founding team is a unique group of industry specialists, providing Fantasy Market with the foundational skills required to build a successful product and company." The FM Whitepaper further represented that this group "ha[d] extensive experience working with the most talented women in the online performance industry, uniquely qualifying us to create this reimagined marketplace." In fact, the three purported team members identified by name and photos in the FM Web Pages were described as: "CTO & Senior Software Engineer," "Lead Front End Web Developer" and "Senior Ethereum Solidity Developer." Each of these purported individuals was entirely fictional.

36. Lucas also made false or misleading statements in his own biography in the FM marketing materials. For example, the FM Whitepaper claimed that "Jonathan sold his first business before turning 23." In fact, Lucas had never sold any businesses. Lucas also claimed to: (1) have majored in Applied Physics with a minor in Women's and Gender Studies and (2)

have been "offered an NSA-funded full scholarship to Stevens Institute of Technology (BS in Cyber Warfare)." In truth, Lucas was never admitted by Stevens Institute of Technology, nor did he graduate from college. Lucas also created a LinkedIn page in which he falsely claimed to be a French-born resident of Las Vegas; Lucas used the photograph of another individual rather than his own picture for the LinkedIn profile.

        C.      **Defendant's Fraudulent Claims Regarding Amount and Use of ICO Proceeds**

        37.      In the FM Whitepaper, Lucas claimed that Fantasy Market had already "held a private, invite only pre-sale, for which 150 institutional/accredited investors filled out the legal paperwork required to participate . . . . The first 18 investors purchased all 25,000,000 FMTs being offered." Lucas similarly claimed in private investor chat rooms in September 2017 that the Fantasy Market ICO had already raised nearly $4.5 million. In truth, there was no "invite-only pre-sale" in which large investors participated and Fantasy Market never raised substantial funds.

        38.      Lucas also misled investors regarding the use of ICO proceeds. Rather than spending ICO funds on development of the platform and hiring of additional team members – as claimed in the FM Whitepaper – Lucas spent virtually all of the proceeds on marketing Fantasy Market.

**VI.**    **Aftermath of the ICO**

        39.      A November 4, 2017 *New York Post* article stated that Lucas admitted to the reporter that Fantasy Market had raised less than $2 million, that the Fantasy Market platform had not yet been built, and that he had decided "in the past 48 hours" that he would return funds to investors. The *New York Post* then published a follow up article two months later on January 8, 2018, reporting that the reporter had received investor complaints about the delay in receiving

their promised refunds. Later that month, Lucas completed refunding investors in their original cryptocurrency investment amounts.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)
### Against Defendant

40. The Commission realleges and incorporates by reference paragraphs 1 through 39 of its Complaint.

41. By virtue of the foregoing, Defendant, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

42. By virtue of the foregoing, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)], promulgated thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a)(1), (2) and (3) of the Securities Act
### Against Defendant

43. The Commission realleges and incorporates by reference paragraphs 1 through 39 of its Complaint.

44. By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendant knowingly, recklessly and negligently: (a) employed

devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

45. By reason of the conduct described above, Defendant, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(1), (2), and (3) [15 U.S.C. § 77q(a)(1), (2), and (3)].

### THIRD CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### Against Defendant

46. The Commission realleges and incorporates by reference paragraphs 1 through 39 of its Complaint.

47. By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendant, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

48. By reason of the conduct described above, Defendant, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Permanently restraining and enjoining Lucas from any future direct or indirect participation in any offering of unregistered securities, from any future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], and from any future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

### II.

Directing Defendant to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### III.

Prohibiting Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

## IV.

Prohibiting Defendant from participating in the issuance, purchase, offer, or sale of any security, digital or otherwise, in an unregistered offering by an issuer.

Dated: New York, New York
September 20, 2019

SECURITIES AND EXCHANGE COMMISSION

By: _____
Marc P. Berger
Lara S. Mehraban
Wendy Tepperman
Richard Hong
Cynthia A. Matthews
Jon A. Daniels
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0056 (Hong)
Email: hongr@sec.gov